IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

SOMER LASHAY WYANT                                                    PLAINTIFF

        VS.                        Civil No. 2:14-cv-2072-MEF

CAROLYN W. COLVIN,
Commissioner of Social Security Administration                       DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Somer Lashay Wyant, brings this action under 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for a period of disability and supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 1382c(a)(3). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g).

## I.  Procedural Background:

Plaintiff filed her application for SSI on August 29, 2012, alleging an onset of disability on August 1, 2008. (T. 161-166) She alleged disability due to post traumatic stress disorder (PTSD), social anxiety, depression, broken left foot, hematic cysts on kidneys, kidney stones, and chronic obstructive pulmonary disease (COPD). (T. 190)  Her application was denied initially and on reconsideration. (T. 69-81, 84-97, 100-103, 107-108) Plaintiff requested an administrative hearing, and the hearing was held on March 14, 2013, before the Hon. Glenn A. Neel, Administrative Law Judge (ALJ). (T. 109-111, 31-63) Plaintiff was present and represented by her attorney, Iva Nell Gibbons. (T. 31, 33)

-1-

Plaintiff was 33 years old at the time of the hearing. (T. 35) She did not complete ninth grade, but she obtained a high school education through a GED program. (T. 36) She went to vocational school for surgical technology, but she did not finish the program. (T. 36) She has worked a variety of jobs in the past 15 years, including, work as a "hanger" for Tyson Foods, in a shoe factory, as a CNA in a nursing home, at convenience stores, as a customer service representative, and as a waitress and cook. (T. 37-43) Her work activity, however, never rose to the level of substantial gainful activity, so she was considered not to have any past relevant work ("PRW"). (T. 24) Plaintiff stopped working on May 15, 2012. (T. 190)

In a Decision issued on June 11, 2013, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 29, 2012, the date of her application for SSI, and that although Plaintiff has the following severe impairments, degenerative joint disease of the left subtalar joint (status - post ankle fracture), history of probable lumbar compression fracture, history of chronic kidney stones, history of chronic obstructive pulmonary disease (COPD), major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder (PTSD), 20 C.F.R. § 416.920(c), Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.920(d), 416.925 and 416.926). (T. 19-21) The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 416.967(a), subject to the following limitations: she can only occasionally climb, balance, stoop, kneel, crouch and crawl; she can only occasionally operate foot controls with her left lower extremity; she must avoid concentrated exposure to temperature extremes, humidity, fumes, odors, dust, gasses, poor ventilation, and hazards; and, and she cannot drive as a part of her work.

Additionally, she must work in an environment where interpersonal contact is incidental to the work performed and the supervision required is simple, direct, and concrete. Finally, she is limited to work in which the complexity of tasks is learned and performed by rote, with few variables and little use of judgment. (T. 21-24) With the assistance of a vocational expert, Montie U. Lumpkin, the ALJ determined that while Plaintiff had no past relevant work because her prior work activity never rose to the level of substantial gainful activity (T. 24), Plaintiff could perform the requirements of representative sedentary, unskilled assembly type jobs such as Lampshade Assembler (DOT#739.684-094) and Buckler/Lacer (DOT#788.687-022), of which there are 1,675 jobs in Arkansas and 72,781 in the national economy, and inspection jobs such as Sorter (DOT#521.687-086) and Type-Copy Examiner (DOT#979.687-026), of which there are 166 jobs in the Arkansas economy and 13,408 jobs in the national economy. (T. 25, 58-61) The ALJ then concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since August 29, 2012, the date Plaintiff's application for SSI was filed. (T. 26)

Plaintiff requested review of the ALJ's decision by the Appeals Council (T. 10). The request for review was denied on February 5, 2014, and the ALJ's decision became the Commissioner's final decision for judicial review. (T. 1-3) *See* 42 U.S.C. § 405(g). Plaintiff filed this action on March 31, 2014. (Doc. 1) This case is before the undersigned pursuant to the consent of the parties. (Doc. 7) Both parties have filed appeal briefs, and the case is ready for decision. (Doc. 9 and 10)

## II.  Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is more that a scintilla, but less than a preponderance, and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Perales*, 402 U.S. at 390; *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a medically determinable physical or mental impairment that has lasted at least one year and that prevents her from engaging in substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3) and 1382(3)(c). A claimant must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require application of a five-step sequential evaluation

process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. 20 C.F.R. §§ 404.1520(a)-(f)(2012).  Only if the final stage is reached does the fact finder consider the claimant's age, education, and work experience in light of his or her residual functional capacity. *McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520 and 416.920 (2012).

### III.  Discussion:

The Court must determine whether substantial evidence, taking the record as a whole, supports the Commissioner's decision that Plaintiff was not disabled since the date of her SSI application on August 29, 2012. Plaintiff raises three issues on appeal: (A) that the ALJ failed to properly develop the evidence; (B) that the ALJ failed to consider evidence which fairly detracted from his findings; and, (C) that the ALJ failed to apply proper legal standards regarding assessment of credibility of subjective complaints, weight given to physician's opinions, determination of Plaintiff's RFC, and in application of the burden of proof at step five of the sequential evaluation process. (Doc. 9, pp. 11-19) Each issue is addressed in turn.

### A.  Failure to Properly Develop the Evidence

Plaintiff argues that the ALJ failed to ask a treating source about limitations or restrictions. (Doc. 9, p. 11-13) She states that her therapists gave GAF scores indicating difficulty functioning in the workplace, that numerous records show recurring kidney problems and complaints of back and

foot/ankle pain, and that there is also evidence of fatigue and side effects from medications. She further contends that the ALJ should have obtained RFC's from her treating physicians.

The ALJ has a duty to fully and fairly develop the record. *Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made). This duty exists "even if ... the claimant is represented by counsel." *Boyd v. Sullivan*, 960 F.2d 733, 736 (8th Cir.1992), quoting *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir.1983). The ALJ, however, is not required to act as Plaintiff's counsel. *Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994) (ALJ not required to function as claimant's substitute counsel, but only to develop a "reasonably complete" record); *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial). There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis. *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994).

The need for medical evidence does not necessarily require the Commissioner to produce additional evidence not already within the record. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001). Providing specific medical evidence to support her disability claim is, of course, the Plaintiff's responsibility, and that burden of proof remains on her at all times to prove up her disability and present the strongest case possible. *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991); 20 C.F.R. §§ 404.1512(a) and (c), 416.912(a) and (c).

Considering the record as a whole in the present case, the ALJ was not required to further

develop the record because it was already "reasonably complete," and it contained sufficient evidence from which the ALJ could make an informed decision.

At the beginning of the administrative hearing, the ALJ inquired whether Plaintiff's counsel had an opportunity to review everything in the electronic folder. Counsel responded in the affirmative. Counsel made no objections to any of the exhibits. When asked by the ALJ, "[a]nd is there some documentary evidence you were wanting to submit?", counsel advised that "[w]e have some outstanding records, Judge," and she identified certain medical providers who were yet to submit some recent medical records. The ALJ agreed to leave the record open to allow for the submission of those additional records. (T. 34-35) The additional medical records were later received and incorporated into the record as Exhibits B14F - B17F. (T. 30, 476-480, 481-486, 487-489, 490-496) It is significant to the Court that Plaintiff's counsel made no mention of the need for any additional medical records or examinations beyond those which were eventually included in the record. See *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993)("it is of some relevance to us that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about").

Plaintiff now argues that the ALJ was obliged to obtain RFC's from her treating physicians. It is the ALJ's role to determine RFC, and although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). Medical records relating to all of Plaintiff's alleged physical and mental conditions were considered by the ALJ, and there was ample medical evidence from which the ALJ could make an informed decision regarding Plaintiff's RFC.

-7-

Other than some limitations associated with Plaintiff's broken left foot (T. 429, 433), none of Plaintiff's physicians or mental health professionals set forth any limitations or restrictions on Plaintiff's activities. Dr. Owens, who initially restricted Plaintiff from any work activities following the fracture to Plaintiff's left foot, gradually released Plaintiff to work activities as the Plaintiff's condition improved. During an office visit on July 5, 2012, Dr. Owens even noted Plaintiff's work status as "on regular duty" (T. 427), and although he advised that she "is not able to return to full activities at work" on that date (T. 429), he released Plaintiff to "return to work when patient feels able" at her next visit on August 6, 2012 (T. 425). Plaintiff returned to see Dr. Owen on January 7, 2013, due to continued complaints of pain in her left ankle. Dr. Owen reported, "[t]he complaint allows weight bearing activity," "[t]he complaint is moderate," and "[t]he symptom is exacerbated by increased activity and weight bearing." (T. 473) A diagnosis of localized osteoarthritis of the ankle was made at that time, and Plaintiff was advised of treatment options, both non-surgical and surgical. (T. 474) During a follow-up visit on January 21, 2013, Plaintiff chose to proceed with surgical care. (T. 471-472) Surgery, an arthrodesis of the subtalar joint, was performed by Dr. Owen on January 22, 2013. (T. 465-466) During a post-operative visit on February 4, 2013, Dr. Owen reported that Plaintiff described her left ankle pain as improving, and his physical exam findings were all normal. (T. 468-470) Plaintiff returned to Dr. Kelly on March 6, 2013 for another post-op follow-up visit. He noted that "[s]he is doing well," and her ankle pain was again described as improving. His physical exam findings were all normal, and his diagnosis was "stable subtalar fusion." He indicated six more weeks of non-weight bearing, that he would allow some motion of her ankle, and that she would be placed in a bootwalker. (T. 488-489) There is nothing in the medical evidence to suggest that Plaintiff's recovery from her left foot/ankle injury would not continue to

improve, and the ALJ's RFC assessment that Plaintiff can only occasionally climb, balance, stoop, kneel, crouch and crawl, and that she can only occasionally operate foot controls with her left lower extremity, adequately takes into account those limitations indicated by Dr. Owens' course of care.

Plaintiff also argues that the ALJ should have obtained additional source information relating to her mental conditions because her therapists gave her GAF scores (30-31 and 50) indicating difficulty functioning in the workplace. (Doc. 9, p. 11) The GAF (Global Assessment Functioning) score is a subjective determination that represents "the clinician's judgment of an individual's overall level of functioning." *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010). The failure to reference a GAF score is not, standing alone, sufficient ground to reverse a disability determination. *Id*., citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). Quoting from *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 511 (6th Cir. 2006), the Court in *Jones* stated, "[a]ccording to the [Diagnostic and Statistical Manual's] explanation of the [Global Assessment Functioning] scale, *a score may have little or no bearing on the subject's social and occupational functioning . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [Global Assessment Functioning] score in the first place*." (Emphasis added.) The Court went on to state that the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings,'" and that denials of disability benefits where applicants had GAF scores of 50 or lower have been affirmed. *Jones*, 619 F.3d at 974-75.

In the present case, the evidence of record shows that during most of her therapist visits Plaintiff's physical appearance was neat/clean, and her speech, mood, affect, thought, social skills,

interaction, and other assessments were normal and appropriate. (T. 400, 402, 404, 405, 406, 407, 444) Employment services were noted to be part of the overall treatment plan. (T. 415) In a 90-day review done on November 11, 2011, it was noted that "[c]lient was seen [one time] during past 90 days review," that "she has not made any progress toward treatment goals/objectives," and that while she continued to deal with anxiety and depression, she "would benefit from continued services *if she will become compliant*." (T. 412) (Emphasis added.) Plaintiff eventually returned to Alternative Opportunities for four more visits dating from November 23, 2011 through March 28, 2012. During her office visit on March 28, 2012, she was noted to be "doing well," and she was to return in 12 weeks. (T. 400) When Plaintiff did not return, she was discharged for the reason that "client failed to return." (T. 398) See *Banks v. Massanari*, 258 F.3d 820, 825-26 (8th Cir. 2001)(ALJ properly discounted claimant's complaints of disabling depression as inconsistent with daily activities and failure to seek additional psychiatric treatment). After a gap in care for more than four months, Plaintiff next sought mental health care on August 3, 2012 at Counseling Associates. (T. 437-440) She was well groomed, had normal thought content, normal thought process, a full affect, normal mood, was cooperative, had no impairment of cognition, and she was noted to have "good judgment and insight" (T. 444) On August 28, 2012[1], she advised her therapist that her physical problems - kidneys, heel - prevent working hard labor (standing for long periods), and that she "wasn't complaining, just noting that she'll have to change and adapt." (T. 447) On November 8, 2012, Plaintiff was discharged from her therapy with Counseling Associates, having "reached goals," her stressors were noted to be either mild (social) or moderate (family, occupational, legal), and her treatment progress was noted as "good, mood stabilized." (T. 461-463)

---

[1] The day before filing her application for SSI benefits.

During visits with her other physicians both before and after her discharge from Counseling Associates, Plaintiff repeatedly denied having psychiatric or psychological symptoms. (T. 454-455, 468-469, 471-472,  474, 479, 482, 484, 488-489, 492)

In her Function Report, Plaintiff reports that she lives with her boyfriend, and while she claims that depression causes her "to cry so much that I can't get out of bed," she spends time with her boyfriend and children, helps to care for her children, visits with friends on the phone, occasionally prepares meals and drives, can manage money, and can follow some instructions. (T. 224-231) During an office visit to Clarksville Family Medical Center on January 2, 2013, she reported that she "is able to do ADL's. . .is able to work." (T. 484)

Upon such evidence as a whole, and despite her GAF scores, the ALJ could adequately determine, without obtaining further medical source information, that Plaintiff's mental impairments only mildly to moderately affected her ability to work. The ALJ's RFC assessment, limiting Plaintiff to sedentary work where interpersonal contact is incidental to the work performed, supervision that is simple, direct and concrete, and an ability to perform work in which the complexity of tasks is learned and performed by rote, with few variable and little use of judgment, appropriately accounted for Plaintiff's mental health symptoms.

Plaintiff contends that the record contains clear evidence of fatigue and side effects to medication, and that the ALJ should have questioned treating sources on how Plaintiff's side effects would impact her physical limitations. (Doc. 9, pp. 12-13) There is, however, not one single instance demonstrated in the record where Plaintiff reported to any of her physicians that she was suffering from medication side effects. To the contrary, the evidence shows that Plaintiff repeatedly denied any medication side effects. (T. 400, 402, 404, 405, 406, 407, 420, 423-424, 427, 445, 455, 462, 468-

-11-

469, 471, 477, 482, 484, 488, 491, 494) Given such evidence before him, it was not necessary for the ALJ to further question Plaintiff's medical professionals about possible limitations relating to something that Plaintiff never complained about.

The evidence of record contains voluminous reports detailing the evaluations and treatment of both Plaintiff's physical and mental impairments. The Court does not believe that these medical and mental health records leave some crucial issue undeveloped or under-developed. The evidence fully and completely documents Plaintiff's physical and mental impairments during the relevant period, and it provides a sufficient basis for the ALJ's decision. The ALJ was not, therefore, obligated to obtain even more medical evidence to develop the record further. If Plaintiff wanted to present more specific information in addition to the medical evidence of record, she had the opportunity and should have done so. *Onstad*, 999 F.2d at 1234. Reversal for failure to fully and fairly develop the record is warranted only where such failure is unfair or prejudicial. *Haley*, 258 F.3d at 748. Plaintiff has not shown that the ALJ failed to develop the record in an unfair or prejudicial manner. Plaintiff's argument on this point must be rejected.

**B.  Failure to Consider Evidence Which Fairly Detracted From the ALJ's Findings**

Plaintiff next argues that the ALJ failed to consider Plaintiff's limitations related to kidneys, fatigue and side effects to medication or headache. (Doc. 9, p. 13) She states that the medical records show multiple ER visits for headaches, ongoing problems with her kidneys, and side effects from her medications. These arguments are also unavailing to Plaintiff.

As discussed above, there is simply no evidence of record that Plaintiff ever complained to any of her physicians about the medication side effects she now alleges.

Concerning her ongoing kidney problems, they have been diagnosed as non-obstructing

bilateral renal stones. (T. 332, 354, 480) In the medical record from Conway Urology dated December 9, 2011, the urologist summarized his findings stating, "no evidence of ureteral stone or obstruction," and "informed her that pain is unlikely to be related to a stone undetected with CT scan . . . [patient] believes her pain is related to stone." (T. 480) During an ER visit on May 14, 2012, Plaintiff complained of problems urinating, stating to the ER staff, "[i]f I get an IV it usually moves those kidney stones and stuff around to where I can urinate," and the report notes, "[m]ultiple ER visits . . . has had extensive workup here and by Dr. C. Brown . . . Referred to Conway Urol[ogy] and *has been non-compliant [with follow-up]*." (T. 367) (Emphasis added.) In general, the failure to obtain follow-up treatment indicates that a person's condition may not be disabling or may not be as serious as alleged. See *Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir. 1995) ("[g]iven his alleged pain, Shannon's failure to seek medical treatment may be inconsistent with a finding of disability").

As for her headaches, the medical evidence shows treatment in a series of ER visits during the fall of 2011. Plaintiff presented to the ER on September 30, 2011 advising that she had 17 teeth pulled last week, and she described a gradual onset of constant, aching pain that was moderate to severe. The physician's clinical impression was "dental pain," an injection of Demerol was given, and Percocet was prescribed. (T. 318-319) Three days later, on October 3, 2011, Plaintiff complained of a headache for two hours and was diagnosed with a "severe tension headache," and an injection of Demerol was administered. (T. 321) Plaintiff returned to the ER again later that same day, this time explaining that she "had teeth pulled recently," "thinks she needs to be on a[n] [antibiotic] for tooth [infection]," and it was noted that she had "multiple rotten teeth still in place." (T. 322) The diagnosis was "headache, teethache," and Plaintiff was instructed to follow up with a dentist. (T.

322) Plaintiff returned to the ER on October 12, 2011, and it was noted, "teeth pulled recently - wants pain meds," and the clinical diagnosis was "[status post] tooth extraction." (T. 324-325) Plaintiff again returned to the ER one week later on October 19, 2011, this time stating that she had a headache for three hours. She was diagnosed with a headache, and she was instructed to follow-up with her primary care physician. (T. 328-329) On a visit to the ER on November 8, 2011, Plaintiff reported that a "migraine and my kidney stones are bothering me and my cyst." She further advised that her headache was "no different from usual," but "her emotional state is upset because her daughter got sent away." She was noted to be employed at Coast 2 Coast at that time. The ER record notes, "9 ER visits in October - [headache], abd[ominal] pain, etc., multiple negative workups." (T. 334) While the medical evidence shows numerous ER visits during which Plaintiff made complaints of head pain, she had just recently had 17 teeth pulled, and there is nothing noted in the ER records reflecting that any physician limited or restricted Plaintiff's activities due to the reported headaches.

Considering the evidence as a whole, it cannot be said that the ALJ erred in failing to consider limitations allegedly associated with Plaintiff's kidney problems, fatigue and side effects to medication, or headaches.

### C.  Failure to Apply Proper Legal Standards

Plaintiff argues that the ALJ failed to apply the proper legal standards when considering (1) the credibility of Plaintiff's subjective complaints, (2) the weight to be given to physician opinions, (3) determination of the Plaintiff's RFC, and (4) the step five analysis.

### 1.  Credibility Determination

Plaintiff asserts that the ALJ failed to cite to anything that could possibly amount to substantial evidence in support of his credibility determination, and she claims that her numerous

visits to the doctor and diagnostic tests lend credibility to her subjective complaints of pain. (Doc. 9, p. 15) Unlike the facts in *Beckley v. Apfel*, 152 F.3d 1056 (8th Cir. 1998) cited by Plaintiff, the inconsistencies that the ALJ relied on to disbelieve Plaintiff's testimony are supported by substantial evidence.

First, the ALJ specifically recognized the proper standard for assessing a claimant's credibility under *Polaski v. Heckler*, 739 F.2d 1320, 1321-22, 751 F.2d 943, 948 (8th Cir. 1984). The ALJ further noted that a claimant's allegations of pain and/or limitations must also be analyzed in accordance with the guidelines set forth in SSR 96-7p. (T. 21) The ALJ stated that, "[c]onsideration was also given to all the evidence related to the claimant's prior work history, as well as to the observations and opinions of treating and examining physicians related to the above matters." (T. 21-22) The ALJ commented that Plaintiff alleges that her impairments have such an adverse effect on her ability to function that she does little other than spend time alone in her room, and that her hearing testimony was similar to the allegations made in her Function Report. (T. 22) While finding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also found that the Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for reasons the ALJ explained in his Decision. (T. 22) Concerning the proper standard to be applied in making that credibility determination, the ALJ recognized that it is a question of fact left to the Commissioner to decide; and, that the question is not whether the evidence supports the existence of an impairment, but whether the evidence of record as a whole can support the claimant's allegations of disabling symptoms (citing *Benskin v. Bowen*, 830 F.2d 878 (8th Cir. 1987)). The ALJ further acknowledged that if there are inconsistencies in the evidence of record as a whole, the ALJ is free to disbelieve the

claimant's subjective complaints and find them not credible (citing *Cruse v. Bowen*, 867 F.2d 1183, 1186 (8th Cir. 1989)). (T. 22)

The Eighth Circuit has held that, "[t]he ALJ is in the best position to guage the credibility of testimony and is granted great deference in that regard." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). If the ALJ discredits a claimant's credibility and gives good reason for doing so, the Eighth Circuit has held that it will defer to the ALJ's judgment even if the ALJ does not cite to *Polaski* or discuss every factor in depth. *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007). In the present case, the ALJ has complied with the Eighth Circuit's preferred practice and has cited to *Polaski*, as well as to Social Security regulations that mirror the *Polaski* factors and expand upon them. Accordingly, the ALJ applied the proper legal standard in making his determination of Plaintiff's credibility.

The ALJ discussed several inconsistencies in the record and gave good reason to discount Plaintiff's credibility. As for Plaintiff's alleged foot and back pain, the ALJ commented that "there is no question that she has suffered painful injuries," noting imaging results that revealed fractures near the heel of her left foot and a probable lumbar compression fracture.[2] Despite Plaintiff's pain complaints, the ALJ noted that the medical records throughout 2012 showed that Plaintiff had full range of movement in her ankle and much of her foot, good dorsiflexion and plantar flexion, normal sensation, and normal reflexes. (T. 23) The ALJ also pointed out that in pre-operative and post-

---

[2] While not specifically discussed by the ALJ, the medical records related to Plaintiff's foot and back injury reveal inconsistencies in the histories given by Plaintiff regarding how the fall occurred: "patient was trying to get away from boyfriend (they were arguing) and jumped off bridge" (T. 373); "she was playing around and fell off a bridge" (T. 375); "she slipped and fell off a bridge" (T. 385). The records also reflect that Plaintiff refused medical treatment and checked out against medical advice (T. 374), then went to another hospital, and then went back to the first hospital again later in the day. (T. 375, 385)

-16-

operative examinations in January and February, 2013, the Plaintiff denied having any muscle pain or swelling, any joint pain, any back pain, or any other myalgias; and, that as of her office visit in March, 2013 (shortly before the administrative hearing), she was observed to be doing well, her pain was improving, and her neurovascular status and reflexes were intact. (T. 23)

As for Plaintiff's complaints of disabling pain from kidney stones, the ALJ acknowledged that Plaintiff sought medical attention for pain and bloody urine on several occasions, but he also noted the inconsistency that there is no indication from any of Plaintiff's treating physicians that Plaintiff's kidney problems prevented her from working. (T. 23) To the contrary, the ALJ commented that examinations performed in 2011 and 2012 showed only that Plaintiff occasionally suffers from non-obstructing stones. The ALJ also observed that Plaintiff's pain complaints have been questioned by medical personnel. (T. 23) The ALJ specifically referenced an ER visit on March 3, 2012, during which Plaintiff stated her pain was a 10 out of 10, but hospital staff reported, "although she relates her pain symptoms are severe, she appears comfortable," and she was diagnosed with a urinary tract infection. (T. 392-393) That observation is also consistent with other medical providers who reported, "9 ER visits in October - [headache], abd[ominal] pain, etc., multiple negative workups," and "multiple ER visits . . . has had extensive workup . . . has been non-compliant with [follow-up]." (T. 334, 367)

The ALJ similarly found no basis to conclude that Plaintiff's history of COPD has been disabling. Noting that although Plaintiff had been given an Albuterol inhaler in December, 2011, and she complained of bronchitis on January 8, 2013, the ALJ correctly noted that the medical evidence of record otherwise contains little mention of this alleged impairment. (T. 23, 431, 454, 468, 471, 473, 478, 488, 492, 495) At her office visit on January 8, 2013, Plaintiff complained of acute

respiratory symptoms, but an examination revealed that her lungs were clear to auscultation, percussion and palpation, with normal chest excursion. She reported smoking one pack of cigarettes per day. Zithromax was prescribed, and Plaintiff was counseled on smoking cessation. (T. 482-483) During an office visit on February 19, 2013, her medications were noted to include a Flovent inhaler and a Ventolin inhaler, but no respiratory symptoms were noted in the review of systems, and her respirations were even and her lungs were clear. She admitted to smoking cigarettes, and a care-plan "How to Stop Smoking" was given. (T. 494-495) During an office visit on March 12, 2013, just two days before her administrative hearing, Plaintiff again admitted to smoking cigarettes. Again, no respiratory symptoms were noted, her respirations were even and her lungs were clear. (T. 491-492) Contrary to Plaintiff's argument, there is absolutely no indication in the record that Plaintiff sought help in quitting smoking. In fact, as the ALJ observed, she was counseled by medical professionals to stop smoking, and she disregarded that counsel and continued to smoke. See *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) (impairments that are controllable or amenable to treatment, including certain respiratory problems, do not support a finding of disability, and failure to follow a prescribed course of remedial treatment, including the cessation of smoking, without good reason is grounds for denying an application for benefits).

Finally, the ALJ commented that while Plaintiff has sought and received treatment to help manage her symptoms of depression, difficult social interactions, poor responses to stress, anxiety, and panic attacks, the evidence does not support her allegations and testimony that her mental impairments are so debilitating that they render her unable to leave her bedroom. The ALJ accurately noted that examinations from August, 2011 through March, 2013 revealed that Plaintiff's mental status had generally been normal. (T. 23) Although Plaintiff occasionally presented as anxious or

-18-

depressed, the record shows that she was consistently alert, oriented, cooperative, with intact judgment and insight, and with normal speech and thought processes. (T. 23) As mentioned above, during visits with her other physicians both before and after her discharge from Counseling Associates, Plaintiff repeatedly denied having psychiatric or psychological symptoms. (T. 454-455, 468-469, 471-472,  474, 479, 482, 484, 488-489, 492)

In sum, it is clear to the Court that the ALJ applied the proper legal standard to the determination of whether Plaintiff's allegations and testimony were credible, and there is substantial evidence of record to support the ALJ's decision to discount Plaintiff's credibility.

### 2.  Weight of Physician Opinion

Plaintiff next contends that the ALJ ignored the opinions from treating sources at Counseling Associates and DaySprings, and gave no reason for doing so. This argument relates to the GAF scores these therapists attributed to Plaintiff, which she urges, are indicative of serious limitations that the ALJ did not properly consider. (Doc. 9, p. 16) Plaintiff also argues that the medical records include a diagnosis and treatment of "uncontrolled headaches and back pain." (Doc. 9, p. 17)

Plaintiff reiterates her position that the ALJ failed to fully and fairly develop the record concerning her alleged limitations from these impairments. As discussed above, GAF scores have no direct correlation to the severity requirements of the mental disorders listings, and denials of disability benefits where applicants had GAF scores of 50 or lower have been affirmed. As of November 8, 2012, Plaintiff was discharged from her therapy with Counseling Associates, having "reached goals," her stressors were noted to be either mild (social) or only moderate (family, occupational, legal), and her treatment progress was noted as "good, mood stabilized." (T. 461-463) It is noteworthy to the Court that none of Plaintiff's mental health professionals, in reliance on GAF

-19-

scores or any other clinical findings, ever indicated, as Plaintiff asserts, that "work would most likely not be an option."

The ALJ discussed the report from a State agency psychological consultant, Susan Daugherty, Ph.D., who on September 20, 2012 opined that Plaintiff's mental impairments mildly limited her activities of daily living but moderately limited her social functioning and concentration, persistence, and pace. (T. 23) Specifically, Dr. Daugherty believed that Plaintiff was moderately limited in her ability to carry out detailed instructions, to sustain an ordinary routine without special supervision, and to respond to work-setting changes. (T. 76-78) She concluded that Plaintiff is able to perform work where interpersonal contact is incidental to work performed, e.g., assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; and, supervision required is simple, direct and concrete (unskilled). (T. 79) On November 29, 2012, a State agency medical consultant at the reconsideration level, Winston Brown, M.D., reached the same conclusions as Dr. Daugherty regarding Plaintiff's mild to moderate limitations. (T. 91-94)

The opinions of the State agency consultants were given significant weight by the ALJ as "they are supported by the many normal findings regarding the claimant's mental status, but they also lend some credence to the claimant's complaints about her ability to concentrate and to function in social settings." (T. 24) This finding by the ALJ recognizes that Plaintiff's own treating physicians have reported similar mild to moderate limitations associated with Plaintiff's mental impairments, and the evidence taken as a whole supports the weight given by the ALJ to the State agency consultants. The record simply does not support Plaintiff's claim that the ALJ applied an improper standard in weighing the physicians' opinions.

With respect to Plaintiff's assertion that the treating sources' records clearly include a

diagnosis and treatment of "uncontrolled headaches and back pain" that the ALJ ignored, the evidence shows otherwise. This is, again, a re-statement of Plaintiff's argument that the ALJ failed to adequately develop the record and not an argument concerning the weight given to physicians' opinions. At any rate, there is no medical evidence of record that Plaintiff's headaches and back pain are "uncontrolled." Plaintiff's ER records indicate that she complained of headaches in the three months after getting 17 teeth pulled, and she received conservative care consisting of pain medication. (T. 318-319, 321, 322, 324-325, 328-329, 334) Plaintiff did complain of low back pain immediately following the bridge incident on May 26, 2011 (T. 373, 385); and, while she was diagnosed with a probable acute compression fracture at L1 (T. 372), her back pain was evidently not so severe to stop her from refusing medical treatment and checking out of the ER against medical advice. (T. 374) Her back pain is rarely mentioned by her treating physicians thereafter. (T. 419-421, 423-425, 427-429, 430-433, 437, 454, 468, 471, 473, 482, 484, 488)

### 3.  RFC Assessment

The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). Adequate medical evidence must therefore exist that addresses the claimant's ability to function in the workplace. See, *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003). The ALJ is not at liberty to make medical judgments regarding the ability or disability of a claimant to engage in gainful activity where such inference is not warranted by clinical findings. *McGhee v. Harris*, 683 F. 2d 256 (8th Cir. 1982). The ALJ determined that Plaintiff has the RFC to perform sedentary work, except that she can only occasionally climb, balance, stoop, kneel, crouch and crawl; she can only occasionally operate foot controls with her left lower extremity; she must avoid concentrated exposure to temperature

extremes, humidity, fumes, odors, dust, gasses, poor ventilation, and hazards; and, and she cannot drive as a part of her work. Additionally, she must work in an environment where interpersonal contact is incidental to the work performed and the supervision required is simple, direct, and concrete. Finally, she is limited to work in which the complexity of tasks is learned and performed by rote, with few variables and little use of judgment. (T. 21-24) Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence of record. (Doc. 9, pp. 17-18) Specifically, Plaintiff asserts that the ALJ failed to include in his RFC all of the Plaintiff's alleged limitations which would have restricted her to less than sedentary work, and that the ALJ points to no medical in support of his RFC. (Doc. 9, p. 17) The Court disagrees.

Plaintiff has failed to show just how the medical evidence is contrary to the ALJ's RFC assessment. A disability claimant has the burden of establishing his or her RFC. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). Plaintiff must present medical evidence proving that her impairments caused severe limitations that precluded work activity, and her conclusory statement of insufficiency by the ALJ will not suffice. 42 U.S.C. § 1382c(a)(3)(A); *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997).

Plaintiff essentially argues again that the ALJ failed to fully develop the record regarding her alleged limitations, and that the ALJ failed to properly consider other conditions and impairments that resulted in additional limitations on her ability to perform work related activities. These issues have already been discussed at length above, and they will not be addressed again here. Suffice it to say that the Court concludes that the ALJ did appropriately consider all of Plaintiff's limitations that are substantiated by clinical findings and are supported by the record as a whole in determining Plaintiff's RFC.

#### 4. Step Five Analysis

The ALJ found that although Plaintiff has had a variety of jobs in the past 15 years, the record does not show that any of her work rose to the level of substantial gainful activity, and the ALJ concluded that Plaintiff has no past relevant work. (T. 24) Considering Plaintiff's age, education, work experience, and RFC at step five of the sequential analysis, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (T. 25) More specifically, and in reliance upon the testimony of a vocational expert (VE), the ALJ found that Plaintiff could perform the requirements of representative occupations in the Dictionary of Occupational Titles ("DOT") such as: assembly type jobs, including Lampshade Assembler (DOT #739.684-094, sedentary, unskilled at SVP 2) and Buckler/Lacer (DOT #788.687-022, sedentary, unskilled at SVP 2), with 1,675 jobs in the Arkansas economy and 72,781 jobs in the national economy; and, inspection jobs, including Sorter (DOT #521.687-086, sedentary, unskilled at SVP 2) and Type-Copy Examiner (DOT #979.687-026, sedentary, unskilled at SVP 2), with 166 jobs in the Arkansas economy and 13,408 jobs in the national economy. (T. 25) Plaintiff argues that the ALJ failed to properly establish Plaintiff's RFC using all the limitations supported by medical evidence, and that the hypothetical questions posed by the ALJ to the vocational expert were improper, were not based on the evidence, and that the vocational expert's testimony could not, therefore, support the ALJ's finding. (Doc. 9, p. 18)

At step five in the sequential process, the ALJ must determine if the claimant can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). Where a claimant suffers from a non-exertional impairment, the ALJ must obtain the opinion of a vocational expert instead of relying on the Medical–Vocational Guidelines. *Baker v. Barnhart*, 457 F.3d 882, 894 (8th Cir.2006). Testimony

from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies. *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007).

At the administrative hearing the ALJ posed a hypothetical question to the vocational expert, asking the VE to assume an individual the same age, education, and past work as Plaintiff, who is limited to sedentary work as defined by the Social Security regulations; who is limited to only occasional climbing, balancing, stooping, kneeling, crouching, crawling; who can only occasionally operate foot controls with the left lower extremity; who must avoid concentrated exposure to temperature extremes, humidity, fumes, odors, dusts, gases, poor ventilation and hazards, to include no driving as part of the work; and, who is able to perform work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote with few variables useful to judgment, and supervision is simple, direct and concrete. (T. 59-60) In response to this hypothetical, the VE testified that the individual could perform the assembly type jobs and inspection jobs mentioned above. (T. 60) When asked if the hypothetical individual could perform no climbing, kneeling, crouching, or crawling, the VE testified that those limitations would have no impact on those sedentary level jobs. (T. 60-61) When asked if the hypothetical individual could perform no operation of foot controls with the left lower extremity, the VE testified that it would have no impact on those sedentary level jobs. (T. 61)

The ALJ relied upon the VE's responses to his hypothetical questions to find that Plaintiff could perform jobs existing in significant numbers in the national economy. (T. 25) Plaintiff's argument on this issue, that a more restricted hypothetical question was needed, reflects nothing more than a restatement of Plaintiff's argument concerning the ALJ's RFC finding. Contrary to

-24-

Plaintiff's contention, an ALJ is not required to question the VE regarding all of the subjective and self-imposed limitations allegedly arising from a claimant's impairments, but only those limitations that the ALJ finds supported by the record as a whole. See *Perkins v. Astrue*, 648 F.3d 892, 901-902 (8th Cir. 2011)(the hypothetical question must capture the concrete consequences of the claimant's deficiencies; the ALJ may exclude any alleged impairments that he has rejected as untrue or unsubstantiated); *Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007)(a hypothetical need only include impairments that are supported by the record and that the ALJ accepts as valid). In this case, the ALJ properly evaluated the medical and other evidence of record in assessing Plaintiff's RFC, included all of the limitations he accepted as substantiated and valid in his hypothetical questions to the VE, and properly relied upon the VE's responses to those hypothetical questions in finding that Plaintiff was able to perform jobs existing in significant numbers in the national economy. As such, the ALJ's determination is supported by substantial evidence. See *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996)(testimony from a vocational expert based on a properly phrased hypothetical question constitutes substantial evidence); *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010).

## IV.  Conclusion

Having carefully reviewed the record, the Court finds substantial evidence supporting the ALJ's decision denying Plaintiff benefits. The ALJ's decision should be, and it hereby is, affirmed. Plaintiff's Complaint should be dismissed with prejudice.

DATED this 1st day of April, 2015.

/s/ *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE